# EXHIBIT A

Electronically Filed by Superior Court of California, County of Orange, 08/09/2024 11:10:12 AM.
30-2024-01418646-CU-PO-NJC - ROA # 4 - DAVID H. YAMASAKI, Clerk of the Court By R. Gardea, Deputy Clerk.

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
CRYOPORT, INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

S.W. and V.W.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
North Justice Center
1275 North Berkeley Avenue
Fullerton, CA 92832

rg ~~700 Civic Center Dr. West, Santa Ana, CA~~

CASE NUMBER: *(Número del Caso):* 30-2024-01418646-CU-PO-NJC

Assigned for All Purposes Judge Scott A Steiner

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Adam E. Polk, Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108 Tel: 415.981.4800

DATE: *(Fecha)* 08/09/2024 DAVID H. YAMASAKI, Clerk of the Court Clerk, by *(Secretario)* Roberta Gardea R. Gardea , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ XX on behalf of *(specify)*: Cryoport, Inc.

under: ☒ XX CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Adam E. Polk (State Bar No. 273000)
Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108

TELEPHONE NO.: 415.981.4800 FAX NO.: 415.981.4846
EMAIL ADDRESS: apolK@girardsharp.com
ATTORNEY FOR *(Name)*: Plaintiffs S.W. and V.W.

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: North Justice Center
MAILING ADDRESS: 1275 North Berkeley Avenue
CITY AND ZIP CODE: Fullerton, CA 92832
BRANCH NAME:

CASE NAME:
S.W, et al. v. CRYOPORT, INC.

## CIVIL CASE COVER SHEET

[X] Unlimited (Amount demanded exceeds $35,000)
[ ] Limited (Amount demanded is $35,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 30-2024-01418646-CU-PO-NJC

JUDGE: Judge Scott A Steiner
DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[X] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: 6
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 9, 2024
Adam E. Polk
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims
  - *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>STREET ADDRESS: 1275 N. Berkeley Ave<br>MAILING ADDRESS: 1275 N. Berkeley Ave<br>CITY AND ZIP CODE: Fullerton 92838<br>BRANCH NAME: North Justice Center | FOR COURT USE ONLY<br>**FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>**Aug 15, 2024**<br>Clerk of the Court<br>By: R. Gardea, Deputy |
|---|---|
| PLANTIFF: S. W. et.al. | |
| DEFENDANT: Cryoport, Inc. | |
| Short Title: W. VS. CRYOPORT, INC. | |
| **NOTICE OF HEARING**<br>**CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>30-2024-01418646-CU-PO-NJC |

Please take notice that a(n), Case Management Conference has been scheduled for hearing on 01/14/2025 at 09:00:00 AM in Department N18 of this court, located at North Justice Center.

**Plaintiff(s)/Petitioner(s) to provide notice to all defendant(s)/respondent(s). Parties who file pleadings that add new parties to the proceeding must provide notice of the Case Management Conference to the newly added parties.**

IMPORTANT: Prior to your hearing date, please check the Court's website for the most current instructions regarding how to appear for your hearing and access services that are available to answer your questions.
Civil Matters - https://www.occourts.org/media-relations/civil.html
Probate/Mental Health - https://www.occourts.org/media-relations/probate-mental-health.html
Appellate Division - https://www.occourts.org/media-relations/appeals-records.html

IMPORTANTE: Antes de la fecha de su audiencia, visite el sitio web de la Corte para saber cuáles son las instrucciones más actuales para participar en la audiencia y tener acceso a los servicios disponibles para responder a sus preguntas.
Casos Civiles - https://www.occourts.org/media-relations/civil.html
Casos de Probate y Salud Mental - https://www.occourts.org/media-relations/probate-mental-health.html
División de apelaciones - https://www.occourts.org/media-relations/appeals-records.html

QUAN TRỌNG: Trước ngày phiên tòa của quý vị, vui lòng kiểm tra trang mạng của tòa án để biết những hướng dẫn mới nhất về cách ra hầu phiên tòa của quý vị và tiếp cận những dịch vụ hiện có để giải đáp những thắc mắc của quý vị.
Vấn Đề Dân Sự - https://www.occourts.org/media-relations/civil.html
Thủ Tục Di Chúc/Sức Khỏe Tinh Thần - https://www.occourts.org/media-relations/probate-mental-health.html
Ban phúc thẩm - https://www.occourts.org/media-relations/appeals-records.html

Clerk of the Court, By: Roberta Gardea, Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**

North Justice Center
1275 N. Berkeley Ave
Fullerton 92838

**SHORT TITLE:** W. VS. CRYOPORT, INC.

| **CLERK'S CERTIFICATE OF SERVICE BY MAIL** | CASE NUMBER: **30-2024-01418646-CU-PO-NJC** |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the above Notice of Hearing has been placed for collection and mailing so as to cause it to be mailed in a sealed envelope with postage fully prepaid pursuant to standard court practices and addressed as indicated below. The certification occurred at Fullerton , California, on 08/15/2024. Following standard court practice the mailing will occur at Sacramento, California on 08/16/2024.

Clerk of the Court, by: Roberta Gardea, Deputy

GIRARD SHARP LLP
601 CALIFORNIA STREET # 1400
SAN FRANCISCO, CA 94108

Electronically Filed by Superior Court of California, County of Orange, 08/09/2024 11:10:12 AM.
30-2024-01418646-CU-PO-NJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By R. Gardea, Deputy Clerk.

Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Adam E. Polk (State Bar No. 273000)
apolk@girardsharp.com
Nina Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Samhita Collur (State Bar No. 348448)
scollur@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF ORANGE, ~~CENTRAL~~ NORTH JUSTICE CENTER**

Assigned for All Purposes
Judge Scott A Steiner

| | |
|---|---|
| S.W. AND V.W.<br><br>Plaintiffs,<br><br>vs.<br><br>CRYOPORT, INC.<br><br>Defendant. | Case No. 30-2024-01418646-CU-PO-NJC<br><br>**COMPLAINT**<br><br>1. Bailment<br>2. Negligence And/Or Gross Negligence<br>3. Conversion<br>4. Trespass to Chattels<br>5. Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 Et. Seq.<br>6. Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs S.W. and V.W. by and through their undersigned counsel, bring this action against Cryoport, Inc. ("Cryoport" or "Defendant") and allege as follows:

## NATURE OF THE ACTION

1. Cryoport offers comprehensive logistics services to facilitate the transportation of fragile, and oftentimes irreplaceable, human reproductive matter and other life sciences materials.

2. Plaintiffs S.W. and V.W. are a married couple who want children and underwent IVF treatments in 2019 to preserve their options and give themselves the best possible chance to grow their family. As a result of their IVF treatments, they were able to create and cryopreserve six healthy embryos.

3. Four years later, in 2023, Plaintiffs were ready to have a child and contracted with Cryoport to transport the six frozen embryos from a fertility clinic in San Francisco, California to the Fertility Center of Orange County ("FCOC") based in Irvine, California. They scheduled an appointment to attempt a pregnancy using the embryos as soon as they were delivered to FCOC.

4. Plaintiffs purchased transportation services from Cryoport. On that purchase, Cryoport became obligated to deliver Plaintiffs' embryos, intact, to FCOC for Plaintiffs' use in a scheduled embryo implantation procedure.

5. Recognizing that embryos entrusted to their care are fragile and irreplaceable, Cryoport promises to its clients, including Plaintiffs, that it uses state-of-the-art technology to ensure that "patients' materials arrive safely and securely."[1]

6. Plaintiffs' embryos were packaged and shipped on November 8, 2023. The shipping containers were clearly marked as containing live specimens.

7. The next day, on November 9, 2023, Plaintiffs received a tracking update by FedEx which purported to show that the embryos had been delivered to FCOC. Despite the delivery status presented in the notification, Cryoport never delivered the embryos to FCOC.

8. Plaintiffs were later informed by Cryoport that the shipping containers with their embryos had been erroneously returned to the Cryoport logistics center located just a few miles from FCOC. In violation of Cryoport's general policy, a Cryoport employee subsequently opened the shipping container

[1] https://www.cryoport.com/applications/reproductive-medicine/.

with Plaintiffs' embryos and removed all of its contents—including the storage units containing their frozen embryos.

9. Cryopreserved materials, like embryos, must be maintained under cold temperatures while being transported to remain viable.

10. When the Cryoport employee removed the embryos from the storage container that kept them safely frozen, the embryos were exposed to an uncontrolled thaw that destroyed them.

11. In conversations and communications with Plaintiffs following the incident, Cryoport has admitted that the actions of its employee, in violation of company policy, caused the damage and destruction to Plaintiffs' embryos.

12. Upon learning the news that their embryos had been damaged and destroyed, Plaintiffs' joy and anticipation for expanding their family quickly turned to devastation.

13. Because of Cryoport's failure to protect and safeguard Plaintiffs' embryos, Plaintiffs lost irreplaceable property, and were emotionally, physically, and psychologically harmed as a result. Plaintiffs bring this action to hold Defendant accountable for its conduct.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over all causes of action alleged in this Complaint pursuant to the California Constitution, article VI, section 10, and is a Court of competent jurisdiction to grant the relief requested.

15. This Court has personal jurisdiction over Defendant because Cryoport purposefully availed itself of the laws and benefits of doing business in California, and Plaintiffs' claims arise out of Defendant's forum-related activities. Furthermore, the events giving rise to Plaintiffs' claims occurred in this county.

16. Venue is proper in this Court pursuant to California Code of Civil Procedure sections 395 and 395.5, and California Business and Professions Code section 17203 because Plaintiffs' injury occurred in Orange County.

## THE PARTIES

17. Plaintiff S.W. is a citizen and resident of Orange County, California.

18. Plaintiff V.W. is a citizen and resident of Orange County, California.

19. Given the sensitive nature of their claims, Plaintiffs are using initials in this litigation to protect their privacy. Plaintiffs will move for an order to continue to use initials in this litigation to protect their privacy if needed.

20. Defendant Cryoport, Inc. is a Nevada company with its principal place of business at 112 Westwood Place, Suite 350 Brentwood, Tennessee 37027.

## FACTUAL ALLEGATIONS

### I. Cryoport Specializes in the Transportation of Fragile Human Reproductive Materials

21. Cryoport Systems, a division of Cryoport, Inc. specializes in transportation solutions for precious, fragile, and irreplaceable life sciences materials, including human reproductive matter. Entities who seek to transport life sciences materials rely on Cryoport's services for safe and secure transportation of their goods.

22. Cryoport represents itself as a "global leader in supply chain solutions" for the life sciences industry and purports to have built "the only premier temperature-controlled shipping systems in the industry that adhere to ISO 21973 standards."[2]

23. Reproductive materials, antibiotics, cell cultures, and other life sciences materials often require temperature-controlled environments when they are transported from one location to another. To meet this need, Cryoport has designed transportation infrastructure that includes "advanced temperature-controlled packaging, informatics, specialized bio-logistics services, bio-storage, bio-services, and cryogenic systems."[3]

24. Cryostork, a branch of Cryoport Systems, specializes in the provision of transportation solutions for fertility clinics and other entities operating in the human reproductive market seeking to transport human reproductive materials, including eggs, sperm, and embryos. Cryoport has substantial experience transporting these materials, and the company's website notes that "90% of U.S. fertility clinics have worked with Cryoport Systems."[4]

---

[2] https://www.cryoport.com/; https://www.cryoport.com/solutions/shipping-systems/.

[3] Cryoport 10-K (March 13, 2024) at 4, available at https://ir.cryoportinc.com/sec-filings/all-sec-filings/content/0001558370-24-003128/cyrx-20231231x10k.htm.

[4] https://www.cryoport.com/applications/reproductive-medicine/clinics/.

25. Human reproductive materials are transported using cryogenic storage systems, which are specialty units designed to maintain extremely low temperatures in order to preserve the materials. Human reproductive materials *must* be maintained at cryogenic (sufficiently low) temperatures to keep the materials frozen. To achieve this, Cryoport transfers reproductive material like human embryos in dewars containing liquid nitrogen. The embryos must remain submerged in the liquid nitrogen throughout transportation to remain safely frozen.

26. Cryoport recognizes that maintaining cryogenic temperatures during the transport of reproductive tissues is "critical for cell integrity to retain viability, stabilize the cells, and ensure reproducible results and successful IVF treatment,"[5] and represents that its shipping containers can sustain cryogenic temperatures for up to ten days.[6] Cryoport further represents that "all of our staff involved in the packaging and shipping process is highly trained to handle reproductive materials specifically."[7]

27. Frozen human reproductive materials must be thawed in a controlled environment to remain viable for use in the future. This controlled process generally involves immersing the tissues in a warm fluid that removes the cryoprotectant substance used to keep the materials frozen. The materials are then immediately placed in an incubator, which allows the materials to properly settle.

28. Human reproductive materials that are inadvertently exposed to outside elements beyond the controlled environment face the risk of damage and destruction. Cryoport recognizes the heavy responsibility it bears in ensuring the safe transport of human reproductive materials. The company's website underscores the "the criticality and responsibility involved in the management of valuable materials for the life sciences" and recognizes that the reproductive materials being transported in its units are "irreplaceable."[8]

## II. In Vitro Fertilization Procedure

29. IVF has become an established means of allowing individuals and couples the opportunity to become pregnant using their biological material. IVF provides the flexibility to begin a family when it

---

[5] *Supra* note 3, at 9.

[6] https://www.cryoport.com/what-you-need-to-know-about-shipping-your-reproductive-materials/.

[7] *Id.*

[8] https://www.cryoport.com/about-us/.

makes sense for individuals and couples personally and professionally. IVF is also a way for those suffering from infertility to start their families, using their own biological material.

30. An IVF cycle typically includes the following steps or procedures: (1) the patient takes medications, including regular injections of hormones, to grow multiple eggs; (2) the clinic retrieves the patient's eggs from the ovary or ovaries; (3) the eggs are inseminated with sperm; (4) the clinic cultures any resulting fertilized eggs, fostering their development into embryos, including with the use of culture media; (5) one or more embryo(s) are placed ("transferred") into the patient's uterus; and (6) the patient takes additional hormones to support of the uterine lining to permit and sustain pregnancy.

31. In certain cases, additional procedures may be employed, including (1) intracytoplasmic sperm injection ("ICSI") to increase the chance for fertilization; (2) assisted hatching of embryos to potentially increase the chance of embryo attachment ("implantation"); and (3) cryopreservation (freezing) of eggs or embryos.

32. The success of IVF largely depends on growing multiple eggs at once and then retrieving the eggs (egg retrieval process). To achieve this goal, patients undergo a strict regimen of injections with hormones and other medicines. These injections can cause a plethora of known side effects, including but not limited to bruising, redness, swelling, or discomfort at the injection site, bloating, weight gain, water retention, bone loss, fatigue, headaches, muscle aches, abdominal pain, breast tenderness, vaginal yeast infections, vaginal dryness, bone loss, hot flashes, mood swings, depression, nausea, vomiting, diarrhea, clots in blood vessels and strokes. Women injected with these pharmaceuticals also run the risk of a potentially fatal allergic reaction to the drugs. And up to 2% of women will develop Ovarian Hyperstimulation Syndrome ("OHSS"), a life-threatening condition that can cause increased ovarian size, nausea and vomiting, accumulation of fluid in the abdomen, breathing difficulties, increased concentration of red blood cells, kidney and liver problems, blood clots, kidney failure, and death.

33. IVF requires multiple doctor visits involving routine blood tests and invasive transvaginal ultrasound examinations, which are often scheduled with very little advanced warning. IVF also places restrictions on diet, work, and travel.

34. The egg retrieval process itself involves surgery conducted under anesthesia, where the eggs are extracted with a large needle inserted through the vaginal wall. Risks of the egg retrieval

procedure include infection, bleeding, trauma to intra-abdominal organs, allergic reactions, low blood pressure, nausea, vomiting, and in rare cases, death. After the retrieval procedure, a patient often experiences residual pain for about a week and may need bedrest for several days.

35. Another potential risk is that the procedure will fail to obtain any eggs, or the eggs may be abnormal or of poor quality and otherwise fail to produce a viable pregnancy.

36. Based on their age and medical status, women may undergo multiple rounds of retrievals to obtain enough eggs or embryos to achieve their reproductive goals. This process can take months or even years. On average, women and couples spend $40,000-$60,000 out of pocket for these services.

37. If and when viable eggs are retrieved, IVF and embryo culture occurs. Sperm and eggs are placed together in specialized conditions (culture media, controlled temperature, humidity, and light) to achieve fertilization. Sperm and eggs are submerged in culture media, which is a nutrient-rich liquid designed to promote the growth and development of a fertilized egg into a viable embryo by replicating the natural environment and fluids in a woman's reproductive system. When they develop successfully, embryos grow and reach certain milestones for viability over the course of several days following insemination.

38. After the egg retrieval process, IVF patients can either receive a fresh embryo transfer or a frozen embryo transfer. A fresh transfer occurs after a few days of embryo development. Embryos are selected for transfer and are placed in the uterine cavity with a tube. By contrast, a frozen transfer involves cryogenically freezing the embryo, then after a period of time, thawing the embryo under tightly controlled conditions to maintain its viability, and placing it in the patient's uterus. Frozen transfers allow a patient to elect to genetically screen the embryos to determine if any suffer from genetic abnormalities making them unsuitable for transfer.

39. If multiple viable embryos are created in an IVF cycle, patients can opt to do a fresh transfer of one or more embryos and freeze others for later transfer attempts. Excess embryos of sufficient quality that are not transferred can be frozen. So long as they are properly stored, frozen embryos can remain viable and be transferred years after they are retrieved.

## III. The Loss of Eggs and Embryos Has Severe Consequences

40. People who engage in fertility services make large monetary and emotional investments. They endure painful and invasive procedures, financial stress, and the strain the process puts on their mental health and relationships with others, all in the hopes that one day they will be able to have a child.

41. In addition to the physical burdens of IVF, the process is also emotionally grueling. The success or failure of IVF, including egg retrieval and embryo storage, has substantial emotional and psychological ramifications for those seeking to become parents.

42. For many, the IVF process represents their last hope for having children. Many women experience and express strong feelings of anxiety, failure, hopelessness, and disappointment during this process. The IVF process can affect a patient and her spouse or partner medically, financially, socially, emotionally, and psychologically. Feelings of anxiety, depression, isolation, and helplessness are not uncommon in patients undergoing IVF. Losing eggs and embryos provokes fear, devastation, and despair. Many people experience grief and anguish when fertility treatment does not result in pregnancy or when they lose fertility choices.

43. As discussed above, women take drug and hormone cocktails and injections over several weeks to stabilize the uterine lining, stimulate ovaries into producing follicles, and stop these ovary follicles from releasing eggs. A woman may be subjected to multiple injections each day, resulting in bruising, swelling, and discomfort. The drug and hormone therapy may also trigger other side effects, such as tiredness, nausea, headaches, and blood clots, as well as negative emotions. The process can limit travel and other activities, entails numerous doctor visits, and often requires time off from work. The retrieval procedure itself requires anesthesia, as well as insertion of a thick needle through the vaginal wall to drain the ovary follicles of their fluid. After the procedure, a woman often experiences residual pain for about a week and may need bed rest for several days. Some women suffer significant side effects, such as ovarian hyperstimulation syndrome, requiring hospitalization.

44. These invasive services are expensive. According to recent estimates, "a single IVF cycle—defined as ovarian stimulation, egg retrieval and embryo transfer—can range from $15,000 to

$30,000, depending on the center and the patient's individual medication needs."[9] Clients typically pay thousands of dollars for fertility drugs leading up to egg retrieval and may also spend hundreds of dollars on acupuncture and other services recommended to them to improve outcomes. Depending on age and health status, some women will undergo (and pay for) more than one IVF cycle, or if they freeze multiple embryos, will pay thousands of dollars for each transfer attempted with an existing embryo.

45. As a provider who specializes in transporting cryogenically frozen reproductive material, Cryoport is aware of the lengths to which people go to obtain eggs and create embryos, how much they mean to patients, the patients' emotional (and financial) investment in the survival of the eggs and embryos, and the patients' expectations that great care will be taken to preserve and protect the eggs and embryos to avoid irreparable, devastating harm.

46. Eggs and embryos are precious. They offer the opportunity to fulfill one of the most fundamental human urges: to become a parent and create one's own family when the time is right. Eggs and embryos are also irreplaceable. The most determinative factor in IVF success is the woman's age at the time her eggs were extracted. At some point, usually around her mid-40s, a woman can no longer produce viable eggs, and eggs from older women are less likely to produce a viable pregnancy and healthy child. When preserved eggs or embryos are damaged or compromised, it may be impossible for clients to build their family as they had planned.

**IV. Plaintiffs' Embryos Were Destroyed Because of Defendant's Conduct**

47. In September 2019, V.W. (then age 35) and S.W. (then age 33) began the process of creating embryos to maximize their fertility options. Plaintiffs created and cryopreserved six healthy embryos at the University of California San Francisco Center for Reproductive Health ("UCSF") while living in the San Francisco Bay Area.

48. Each of the six embryos was euploid, healthy, and viable. They were graded 5AA, 5AA, 5AA, 5BA, 4AA, and 5BC. All were genetically tested and had no abnormalities.

49. Plaintiffs subsequently moved to Southern California, and continued their fertility care at a new clinic, FCOC, based in Irvine, California,

[9] https://www.forbes.com/health/womens-health/how-much-does-ivf-cost/.

50. In 2023, Plaintiffs prepared to use their embryos and expand their family. They scheduled an implantation at FCOC on December 21, 2023. To prepare for the implantation, they underwent the required testing and examinations and contacted Cryoport to arrange for the transportation of their six frozen embryos from UCSF to FCOC.

51. Cryoport provided a quote to Plaintiffs on October 3, 2023 and represented that it could provide "exclusive fertility shipping services, along with reassurance and support." The services advertised as included in the standard transport services package included "The Client Care Team utilizes our Logistics Management Platform to continuously collect and monitor data throughout the entire transport" and "Smartpak® Condition Monitoring System: Tracks GPS location and temperature."

52. On October 23, 2023, Plaintiffs purchased Cryoport's quoted transportation services to transport their six frozen embryos from San Francisco to Irvine.

53. On November 8, 2023, Plaintiffs' six healthy frozen embryos were packaged in Cryoport's transportation dewar at UCSF. The packages were clearly labeled as containing live specimens.

54. Cryoport provided the transportation dewar and was responsible for coordinating the transportation but contracted with FedEx to physically take the dewar from UCSF to FCOC.

55. Over the course of the next few days, Plaintiffs received tracking updates from FedEx confirming that the embryos were en route to the delivery address, which was correctly listed for FCOC.

56. On Thursday, November 9, 2023, Plaintiffs received a tracking update that purported to show that the embryos had been delivered to FCOC, but the space to indicate who had signed for the shipment was blank.

57. That same day, FCOC contacted Cryoport to report that, despite the delivery confirmation email, it had not received Plaintiffs' embryos.

58. It was not until the next day, November 10, 2023, that Cryoport revealed to Plaintiffs and FCOC the detail of what had happened.

59. According to Cryoport, the shipping container had instead been erroneously delivered to Cryoport's logistics center located just a couple miles away from FCOC. Cryoport also informed Plaintiffs that after the shipping container reached Cryoport's facility, a Cryoport employee opened the container with Plaintiffs' embryos and removed all of its contents—including the storage units containing their

frozen embryos. The embryos were eventually placed back into a shipping container and delivered to FCOC in a damaged or destroyed state.

60. Cryoport further confirmed that the shipping container with Plaintiffs' embryos was clearly marked as containing live specimens, and that Cryoport's policy is to never open containers that contain live specimens, but instead for staff to immediately elevate the presence of such a shipping container at the logistics center.

61. Cryoport provided temperature stability reports to Plaintiffs—designed to ensure the safe transportation of frozen material—which are consistent with the timeline alleged above. The first report contains temperature readings for the storage container from November 6 to November 9, 2023. The log ends at approximately 19:00 UTC, or 1:00pm local time, which is around the reported time that Cryoport removed the contents of the dewar. Although Cryoport has not confirmed precisely when Plaintiffs' embryos were placed back into a dewar after they were discovered, the next temperature stability report does not report any temperature readings until just before November 11 at 00:00 UCT, or November 10 at 4:00pm local time.

62. Cryoport has acknowledged that Plaintiffs' embryos were damaged and destroyed as a result of its employee. Cryoport admitted these facts on phone calls with Plaintiffs and in other materials provided to Plaintiffs and also expressed condolences to Plaintiffs for the loss of their embryos. All of Plaintiffs' embryos were destroyed due to Cryoport's failure to safely and securely transport and deliver Plaintiffs' embryos to FCOC.

63. At Plaintiffs' request, FCOC thawed and examined the embryos to see if any could still be used to attempt a pregnancy. This testing confirmed that the embryos were destroyed and no longer viable. FCOC's report describes that each of the embryos were "filled with bubbles" and degenerated. None survived.

64. As Plaintiffs grieved their loss following Cryoport's destruction of their six embryos, they still longed to grow their family, though V.W. is now 40 years old. They were able to achieve a pregnancy in January 2024 but learned in February and confirmed in March that the baby had Trisomy 18, a rare genetic condition associated with major congenital abnormalities and more common for mothers of advanced maternal age. They saw an obstetrician specializing in high-risk pregnancies who confirmed

that the baby's defects were fatal and the pregnancy nonviable. Plaintiffs were and remain completely devastated. They had planned ahead and frozen embryos to avoid genetic issues, but because of Cryoport, their embryos were not available when they needed them.

**V. Cryoport Makes Several Public Representations About the Quality of its Services**

65. Before and at the time Plaintiffs purchased transportation services from Cryoport, Cryoport held itself out as a gold standard transportation company with state-of-the-art technology and emphasized that human reproductive materials would be safely transported to its customer's desired destination.

66. The below representations can all be found on Cryoport's website and existed there prior to Plaintiffs' purchase of Cryoport's transportation services:

a. "We incorporate state-of-the-art informatics and data monitoring technology into our systems to provide near-real time traceability. Clients trust us because our processes are proven to maintain both Good Manufacturing Practice (GMP) and Good Distribution Practice (GDP) standards no matter the material type."[10]

b. "At Cryoport Systems, we are dedicated to **setting the industry standard for quality and safety** in the temperature-controlled supply chain. Our comprehensive approach to risk mitigation ensures the highest level of reliability across our entire platform of supply chain solutions."[11]

c. "From our precision-engineered shipping systems that offer meticulous attention to detail for the safe transport of sensitive materials to our transportation and logistics solutions that are designed to proactively mitigate risk, we are dedicated to ensuring the integrity of your temperature-controlled supply chain at every stage."[12]

d. "Our exclusive courier services are the most reliable on the market, and our cutting-edge technology, equipment, and standardized procedures ensure that patient materials arrive safely and securely."[13]

---

[10] https://www.cryoport.com/solutions/shipping-systems/.

[11] https://www.cryoport.com/about-us/quality/.

[12] *Id.*

[13] https://www.cryoport.com/applications/reproductive-medicine/.

e. "At Cryoport Systems, we understand the criticality and responsibility involved in the management of valuable materials for the life sciences. In many cases, we're dealing with irreplaceable therapies, vaccines, research materials, and reproductive materials for our clients and partners.[14]

f. "Cryoport Systems sets the standard for quality and safety in the temperature-controlled supply chain."[15]

g. "All of our staff involved in the packaging and shipping process is highly trained to handle reproductive materials specifically."[16]

67. In addition to the website representations, Cryoport made similar representations on the quote for services provided to Plaintiffs, titled "Cryoport Systems Shipping Quote," including

a. "Cryoport Systems is pleased to offer you our exclusive fertility shipping services, along with reassurance and support as you take the next step towards building your family."

b. "The Client Care Team utilizes our Logistics Management Platform to continuously collect and monitor data throughout the entire transport."

68. Plaintiffs reviewed Cryoport's website and order form prior to deciding to hire them to provide transportation services, and relied on Cryoport's statements regarding the quality of their services.

## COUNT I

### Bailment

69. Plaintiffs repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

70. Plaintiffs incorporate the above and below allegations by reference.

71. Plaintiffs delivered to Cryoport for safekeeping irreplaceable personal property to be safely and securely kept for the benefit of Plaintiffs, and to be redelivered to them upon demand.

72. Cryoport received Plaintiffs' embryos on this condition.

---

[14] https://www.cryoport.com/about-us/.

[15] https://www.cryoport.com/about-us/quality/.

[16] https://www.cryoport.com/what-you-need-to-know-about-shipping-your-reproductive-materials/.

73. Plaintiffs agreed to pay, and did pay, substantial sums in exchange for Cryoport's promise to safeguard reproductive material for the benefit of Plaintiffs.

74. Plaintiffs gave Cryoport exclusive possession and control of Plaintiffs' invaluable personal property (i.e., the embryos). Cryoport knowingly accepted Plaintiffs' invaluable personal property (i.e., the embryos).

75. Cryoport had a duty to exercise care in maintaining, preserving, and protecting Plaintiffs' embryos that were delivered to Cryoport. Further, Cryoport had a duty to return the embryos, undamaged, to Plaintiffs, to whom the embryos belonged, including by delivering them to Plaintiffs' designated recipient fertility clinic.

76. Cryoport invited the general public, including Plaintiffs, to entrust eggs and embryos to Cryoport's care by holding out Cryoport as a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a safe and satisfactory manner, and in a manner specified on their websites.

77. Because of Cryoport's wrongful conduct, as set forth herein, the irreplaceable property of Plaintiffs was destroyed, precluding its redelivery to them.

78. Cryoport breached their duty to exercise care in the safekeeping of Plaintiffs' embryos delivered to Cryoport and to return the embryos, undamaged, to Plaintiffs.

79. As a direct and proximate result of Cryoport's breach of bailment contract, Plaintiffs have been deprived of the opportunity to use the embryos they entrusted to Cryoport and have suffered damages in an amount to be determined at trial.

## COUNT II

### Negligence and/or Gross Negligence

80. Plaintiffs incorporate the above and below allegations by reference.

81. Cryoport owed Plaintiffs a duty to exercise the highest degree of care when transporting, handling, and monitoring the temperature-controlled storage units used to transport Plaintiffs' embryos.

82. Cryoport owed a duty of care to Plaintiffs to act reasonably in all aspects of the handling and transport of Plaintiffs' embryo so as to avoid destroying them, damaging them, or jeopardizing their

viability given that doing so would inevitably lead to the loss of invaluable property, physical, and emotional distress.

83. Cryoport assumed that duty of care through communications with Plaintiffs and by reason of Cryoport's special relationship with Plaintiffs arising from the sensitive services Cryoport undertook to perform—transporting fragile and irreplaceable reproductive materials.

84. Plaintiffs' harm occurred in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious harm. As Cryoport states in its marketing, the company is "dedicated to setting the industry standard for quality and safety in the temperature-controlled supply chain" and offers "the most reliable [courier service] on the market" designed to "ensure that patient materials arrive safely and securely."

85. It was reasonably foreseeable to Cryoport that Plaintiffs would experience economic loss and severe emotional distress as a result of Cryoport's breach of its duty of care.

86. Cryoport's carelessness and gross negligence directly and foreseeably damaged Plaintiffs. Plaintiffs entrusted Cryoport with transporting, handling, and monitoring their invaluable embryos, and Cryoport's mishandling of their embryos naturally and foreseeably caused economic loss, mental anguish, and emotional distress, among other injuries, to Plaintiffs.

87. There was a close connection between Cryoport's conduct and Plaintiffs' injuries. Plaintiffs' economic loss, emotional distress, and other harms occurred because of Cryoport's failure to act reasonably in all aspects of the transportation, handling, and monitoring of Plaintiffs' embryos.

88. Plaintiffs entrusted Cryoport to use reasonable care to safeguard their embryos to preserve their reproductive options. Cryoport's carelessness with this precious material, and ultimately, with Plaintiffs' careful plans for parenthood, is reprehensible.

89. Cryoport is a common carrier. A common carrier generally has a duty to act as an insurer for the goods it transports.

90. Imposing a duty on Cryoport to avoid causing emotional distress and loss of invaluable property would promote the policy of preventing future harm, insofar as it will be motivated to implement more effective processes and systems to ensure that eggs and embryos are transported safely going

forward. Imposing a duty on Cryoport to avoid causing emotional distress also furthers the community's interest in ensuring that reliable fertility services are available to those who wish to become parents.

91. The burden on Cryoport from a duty to avoid causing economic loss and emotional distress is fair and appropriate in light of the importance of the eggs and embryos it voluntarily agreed to protect, at considerable cost to Plaintiffs.

92. Cryoport owed Plaintiffs a non-delegable duty of care with respect to the maintenance and protection of the embryos entrusted to their care.

a. Cryoport breached these duties and acted with negligence and gross negligence in at least the following respects:

b. failing to properly safeguard the embryos in its care;

c. failing to follow Cryoport's own policies and procedures for handling transportation containers with live specimens;

d. failing to adequately monitor the location of the storage unit containing Plaintiffs' embryos;

e. failing to properly train and supervise staff responsible for the cleaning and maintenance of storage units.

f. failing to disclose that it did not have appropriate processes and systems in place to protect Plaintiffs' embryos.

93. Cryoport's acts and omissions constitute gross negligence because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of embryos.

94. Cryoport acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiffs. Cryoport's acts and omissions had a great probability of causing significant harm and in fact did cause such harm—the loss of Plaintiffs' invaluable property.

95. As a proximate result of Cryoport's negligence and/or gross negligence, Plaintiffs suffered economic loss in an amount to be determined at trial, including the loss of irreplaceable and invaluable property. A reasonable person would be unable to cope with the losses suffered by Plaintiffs.

96. As a proximate result of Cryoport's negligence, Plaintiffs suffered harm in an amount to be determined at trial, including economic loss and severe emotional distress consisting of shock, fright, horror, anguish, suffering, grief, anxiety, nervousness, embarrassment, humiliation, and shame.

97. The foregoing acts were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### Conversion

98. Plaintiffs incorporate the above and below allegations by reference.

99. Plaintiffs owned and had the right to possess their embryos, which are unique items of personal property.

100. Cryoport substantially interfered with Plaintiffs' embryos by intentionally failing to properly maintain the frozen embryos in a safe environment, removing them from the transportation dewar, and exposing them to an uncontrolled thaw, which was a substantial factor in the destruction of Plaintiffs' embryos. Cryoport knew, or should have known, that removing the embryos from the transportation dewar would destroy the embryos.

101. Plaintiffs did not consent to their embryos being destroyed. Plaintiffs were harmed when their embryos were destroyed; they lost invaluable property that could have enabled them to have a child and were emotionally and physically harmed.

## COUNT IV

### Trespass to Chattels

102. Plaintiffs incorporate the above and below allegations by reference.

103. Plaintiffs owned or had the right to possess their reproductive material—their six frozen embryos—that was destroyed by Cryoport's mishandling of Plaintiffs' embryos.

104. Cryoport intentionally interfered with Plaintiffs' possession of their embryos by removing them from the transportation dewar, and by failing to safely and securely transport and deliver Plaintiffs' six frozen embryos to FCOC so Plaintiffs could use the embryos to grow their family.

105. Plaintiffs did not consent to or authorize the damage and destruction to their embryos as a result of Cryoport's failure to safely and securely transport and deliver Plaintiffs' embryos.

106. Defendant caused physical damage to Plaintiffs' personal property when it failed to safely and securely transport Plaintiffs' embryos.

## COUNT V

**Violation of Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §§ 1750, et seq.**

107. Plaintiffs incorporate the above and below allegations by reference.

108. Cryoport is a "person" under Cal. Civ. Code § 1761(c).

109. Plaintiffs are "consumers" under Cal. Civ. Code § 1761(d).

110. Plaintiffs' purchase of Defendant's services constitute "transactions" under Cal. Civ. Code § 1761(e).

111. Defendant's services are "services" under Cal. Civ. Code § 1761 (a-b).

112. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

113. As alleged herein, Defendant engaged in unfair or deceptive acts or practices in violation of the CLRA, Cal. Civ. Code § 1750, *et seq.* by, among other things, representing that Defendant's services have characteristics, uses, benefits, and qualities which they do not have; representing that their services are of a particular standard, quality, and grade when they are not; and advertising their services with the intent not to sell them as advertised. Cal Civ. Code § 1770 (5), (7), and (9).

114. Defendant actively failed to disclose and concealed material facts about its services, and otherwise engaged in activities with a tendency or capacity to deceive a substantial portion of the purchasing public, as described herein.

115. Defendant could have readily disclosed the entire truth regarding the risks connected to its services to Plaintiffs through various sources, including its website and marketing materials.

116. Defendant's CLRA violations materially affected the decisions of Plaintiffs. Plaintiffs reasonably relied upon Defendant's material omissions and partial claims regarding the quality of their services and would not have purchased those services had they known the truth.

117. As a result of the CLRA violations described herein, Plaintiffs have suffered actual damages.

118. Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek actual damages, injunctive relief, restitution, punitive damages, recovery of attorneys' fees and costs, and any other relief that the court deems proper for Defendant's violations of the CLRA.

119. Venue is proper under California Civil Code § 1780(d) because Cryoport does business in Orange County where a substantial portion of the acts and omissions at issue occurred. Plaintiffs' CLRA venue declaration is attached as **Exhibit 1** to this complaint.

120. On July 8, 2024, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of the letter is attached hereto as **Exhibit 2**.

## COUNT VI

### Violation of California Unfair Competition Law ("UCL")

### Cal. Bus. & Prof. Code § 17200 *et seq.*

121. Plaintiffs incorporate the above and below allegations by reference.

122. The UCL prohibits acts of "unfair competition," including any "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200. 125.

123. Cryoport violated each of the UCL's provisions: it acted in an unlawful, unfair, and fraudulent manner, including disseminating unfair, deceptive, untrue or misleading advertising…."

124. Defendant Cryoport is a "person" under Cal. Bus. & Prof. Code § 17201.

125. Cryoport acted unlawfully. Section 17200's "unlawful" prong "borrows violations of other laws … and makes those unlawful practices actionable under the UCL" *Klein v. Chevron U.S.A., Inc.*, 202

Cal. App. 4th 1342, 1383 (2012), as modified on denial of reh'g (Feb. 24, 2012. '[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a … [section] 17200 'unlawful' violation." *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006) (internal citations omitted). Cryoport violated the law through its gross negligence, bailment violations, trespass to chattels, conversion, and CLRA violations. See *supra* Claims 1–5.

126. Cryoport also acted unfairly and fraudulently through its unfair, deceptive, untrue or misleading advertising and representations to Plaintiffs and the public.

127. Unfair, deceptive, untrue, or misleading advertising under the UCL means:

> For any person, ...corporation ... or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . .or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading....
>
> Cal. Bus. & Prof. Code § 17500.

128. Cryoport's conduct is unfair and fraudulent in violation of the UCL because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.

129. Cryoport voluntarily took responsibility for safeguarding Plaintiffs' embryos, and misled Plaintiffs and the public concerning the services it provided, specifically in the quality of care it would use to safely transport eggs and embryos. In particular, Cryoport advertised on its website the following misleading or untrue statements:

a. "We incorporate state-of-the-art informatics and data monitoring technology into our systems to provide near-real time traceability. Clients trust us because our processes are proven to maintain both Good Manufacturing Practice (GMP) and Good Distribution Practice (GDP) standards no matter the material type."

b. "At Cryoport Systems, we are dedicated to setting the industry standard for quality and safety in the temperature-controlled supply chain. Our comprehensive approach to risk mitigation ensures the highest level of reliability across our entire platform of supply chain solutions."

c. With our platform of scalable, risk-mitigation solutions, innovative technology, and dedicated team of people, Cryoport Systems is committed to going above and beyond to enable the outcomes for the advancing life sciences industry."

d. "Our exclusive courier services are the most reliable on the market, and our cutting-edge technology, equipment, and standardized procedures ensure that patient materials arrive safely and securely."

e. "At Cryoport Systems, we understand the criticality and responsibility involved in the management of valuable materials for the life sciences. In many cases, we're dealing with irreplaceable therapies, vaccines, research materials, and reproductive materials for our clients and partners.

f. "Cryoport Systems sets the standard for quality and safety in the temperature-controlled supply chain"

130. Cryoport knew or should have known through the exercise of reasonable care that these statements were untrue or misleading. For example, Cryoport represented to Plaintiffs and the public that their courier services are "the most reliable on the market," which was demonstrably untrue given the loss of Plaintiffs' embryos, and there is no evidence that Cryoport had the procedures in place to verify that this statement was true.

131. The gravity of the harm resulting from Cryoport's unlawful, unfair, and fraudulent conduct outweighs any potential utility of the conduct. There are reasonably available alternatives that would further Cryoport's business interests, such as implementing standardized procedures to ensure safe delivery of the property entrusted to it and properly training employees, and not misrepresenting the procedures and protections in place to protect Plaintiffs' embryos.

132. The harm from Cryoport's unlawful, unfair, and fraudulent conduct was not reasonably avoidable by Plaintiffs. Plaintiffs had no reasonable means of discovering the inadequacies in Cryoport's procedures to handle the transport of human reproductive materials.

133. As a direct and proximate result of Cryoport's unlawful, unfair, and fraudulent conduct, Plaintiffs have lost invaluable property, their embryos, which are treated as property under California law.

Plaintiffs also lost money, including the money spent on their IVF treatment, testing to confirm the embryos were destroyed, and costs related to the genetic testing of their subsequent pregnancy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court enter judgment against Defendant through an order:

a. Declaring that the Defendant's conduct violates the laws and standards referenced above;

b. Finding in favor of Plaintiffs on all counts asserted herein;

c. Granting Plaintiffs compensatory, restitutionary, rescissory, general, consequential, punitive damages and/or exemplary damages in an amount to be determined at trial;

d. Enter appropriate equitable relief;

e. Awarding prejudgment and post-judgment interest on all amounts awarded to the fullest extent allowed under the law;

f. Awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs of suit as permitted by law; and

g. Such other and further relief as the Court deems necessary or appropriate.

**DEMAND FOR JURY TRIAL**

NOTICE IS HEREBY GIVEN that Plaintiffs herein demand trial by jury in the above-entitled action.

Dated: August 9, 2024

Respectfully submitted,

*/s/ Adam E. Polk*

Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Adam E. Polk (State Bar No. 273000)
apolk@girardsharp.com
Nina Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Samhita Collur (State Bar No. 348448)
scollur@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400

San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

# EXHIBIT 1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

S.W. and V.W., declare as follows:

1. We have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2. We are the Plaintiffs in the above-captioned action.

3. We are residents of Ladera Ranch, California.

4. We submit this declaration in support of the Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code section 1750 *et seq.*

5. The complaint has been filed in the proper place for trial under California Civil Code Section 1780(d).

6. Defendant Cryoport, Inc. does business in Orange County, California where a substantial portion of the acts and omissions at issue occurred.

7. We purchased transportation services from Defendant in California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge. Executed on July 18, 2024 in Ladera Ranch, California.

*/s/ S.W.*
S.W.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge. Executed on July 18, 2024 in Ladera Ranch, California.

*/s/ V.W.*
V.W.

EXHIBIT 2

GIRARD
SHARP

July 8, 2024

**VIA CERTIFIED MAIL**

Sarah C. Trankiem
Sarah.Trankiem@btlaw.com
2029 Century Park East, Suite 300
Los Angeles, CA 90067

**Re: Notice of Legal Violation:**
**Cryoport's Mishandling of Frozen Embryos**

Girard Sharp LLP represents [redacted] and [redacted], a married couple who purchased Cryoport, Inc.'s ("Cryoport") transportation services to move six healthy and viable frozen embryos from a fertility center in San Francisco to another fertility center in Irvine, Califonia. In October 2023, [redacted] engaged Cryoport to transport their frozen embryos in advance of a planned frozen embryo implantation procedure. Cryoport staff failed to properly monitor and handle the shipper containing [redacted]' frozen embryos and exposed the embryos to an uncontrolled thaw, thereby damaging or destroying the embryos.

[redacted] have now learned that Cryoport's representations regarding the quality of their transportation services and staff are false and misleading. Generally, Cryoport represents that it provides a high quality of care in transporting human reproductive materials like embryos, such as statements that "[o]ur exclusive courier services are the most reliable on the market, and our cutting-edge technology, equipment, and standardized procedures ensure that patient materials arrive safely and securely." Cryoport also makes representations about the quality and training of its employees, and states "all of our staff involved in the packaging and shipping process is highly trained to handle reproductive materials specifically." Furthermore, Cryoport represents in the "Cryoport Systems Shipping Quote" that it provides "reassurance and support as you take the next step towards building your family" and "continuously collect[s] and monitor[s] data throughout the entire transport." Tragically, [redacted]' embryos were not properly monitored and were ultimately transported in a manner that destroyed their viability. [redacted] would not have purchased Cryoport's transportation services or experienced significant distress at the outcome had they known the truth of the unsafe conditions allowed to exist within Cryoport's business.

With this letter, [redacted] request that Cryoport take prompt action to remedy this problem.

## STATEMENT OF VIOLATIONS

Companies such as Cryoport violate California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, when they engage in false, misleading, or deceptive practices in connection with transactions, including the sale of transportation services for irreplaceable life sciences materials like embryos.

Cryoport has violated the CLRA by:

- Representing that services have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;
- Representing that services are of a particular standard, quality, or grade, if they are of another;
- Advertising services with intent not to sell them as advertised;
- Representing that services have been supplied in accordance with a previous representation when they have not.

If Cryoport does not take prompt action, [redacted] intend to bring claims for monetary relief under the CLRA.

Please direct all communications or responses regarding this notice to the following counsel:

**GIRARD SHARP LLP**
Adam E. Polk (SBN 273000)
Nina R. Gliozzo (SBN 333569)
Samhita Collur (SBN 348448)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: apolk@girardsharp.com
Email: ngliozzo@girardsharp.com
Email: scollur@girardsharp.com

## REQUESTED REMEDIES

[redacted] DEMAND THAT WITHIN THIRTY DAYS after this notice is served on you, you remedy your violations by doing the following:

A. Provide [redacted] payments to compensate their lost embryos, emotional distress caused by that loss, as well as any consequential costs; and reimbursement of the purchase price attributable to the purported quality of Cryoport's transportation services.

B. Pay into an escrow account an amount of money sufficient to pay [redacted]' attorneys' fees and costs.

Please contact us within thirty days to discuss Cryoport's implementation of these remedies. Furthermore, please acknowledge receipt of this letter by emailing the attorneys listed above.

Sincerely,

**GIRARD SHARP LLP**

Adam E. Polk

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):

Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its website as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ORANGE

## ADR Information

Introduction.

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

BENEFITS OF ADR.

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

Save Time. A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

Save Money. When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

Increase Control Over the Process and the Outcome. In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

Preserve Relationships. ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

Increase Satisfaction. In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

Improve Attorney-Client Relationships. Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

DISADVANTAGES OF ADR.

ADR may not be suitable for every dispute.

Loss of protections. If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

Less discovery. There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

Additional costs. The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

Effect of delays if the dispute is not resolved. Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

Arbitration. In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." Binding arbitration means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. Nonbinding arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

Cases for Which Arbitration May Be Appropriate. Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

Cases for Which Arbitration May Not Be Appropriate. If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

Mediation. In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

Cases for Which Mediation May Be Appropriate. Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

Cases for Which Mediation May Not Be Appropriate. Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

Neutral Evaluation. In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

Cases for Which Neutral Evaluation May Be Appropriate. Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

Cases for Which Neutral Evaluation May Not Be Appropriate. Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

Settlement Conferences. Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

ADDITIONAL INFORMATION.

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, at 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the telephone directories under "Arbitrators" or "Mediators"

Low cost mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA). For information regarding DRPA, contact:

- OC Human Relations (714) 480-6575, mediator@ochumanrelations.org
- Waymakers (949) 250-4058

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO.:<br>NAME:<br>FIRM NAME:<br>STREET ADDRESS:<br>CITY: STATE: ZIP CODE:<br>TELEPHONE NO.: FAX NO.:<br>E-MAIL ADDRESS:<br>ATTORNEY FOR (name): | FOR COURT USE ONLY<br><br>For your protection and privacy, please press the Clear This Form button after you are done printing this form. |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>JUSTICE CENTER:<br>☐ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512<br>☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13th Street, Westminster, CA 92683-4593 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION | CASE NUMBER: |

Plaintiff(s)/Petitioner(s), ______________________________

______________________________

and defendant(s)/respondent(s), ______________________________

______________________________

agree to the following dispute resolution process:

☐ Mediation

☐ Arbitration (must specify code)

☐ Under section 1141.11 of the Code of Civil Procedure

☐ Under section 1280 of the Code of Civil Procedure

☐ Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐ I have an Order on Court Fee Waiver (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐ The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals. We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court, rule 3.720 et seq.

Date: ____________ ______________________ ______________________

(SIGNATURE OF PLAINTIFF OR ATTORNEY) (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: ____________ ______________________ ______________________

(SIGNATURE OF DEFENDANT OR ATTORNEY) (SIGNATURE OF DEFENDANT OR ATTORNEY)